James DeBRY, Robert J. DeBry and
Lynn M. Hilton,
Plaintiffs-Appellants,

v.

TRANSAMERICA CORPORATION,
Defendant-Appellee.

No. 77–1894.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted March 13, 1979.

Decided May 31, 1979.

Adam M. Duncan, Salt Lake City, Utah (Ralph R. Mabey and Alan L. Smith, Salt Lake City, Utah, on brief), for plaintiffs-appellants.

Dennis McCarthy of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah (Robert M. Anderson and Robert K. Rogers of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, on brief), for defendant-appellee.

Before DOYLE, McKAY and LOGAN, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

## I.

### PRELIMINARY STATEMENT

This action was filed by the plaintiffs-appellants against Transamerica Corporation seeking damages for alleged fraud involving an exchange of stock transaction. Plaintiffs transferred their stock in a travel organization, Foreign Study League, Inc., to Transamerica, the defendant. They received 221,273 shares of Transamerica stock, which was unregistered in exchange for all of their travel organization stock. The plaintiffs said that they were induced to make this trade by promises or representations which led them to believe that the stock in Transamerica which they received would become registered after a time, whereby it would have much more value than the unregistered stock which they received. They claim damages based upon the failure of Transamerica to get the stock registered for them. The demand is for a very large sum of money, $1,691,380, as a result of the stock not being registered, $563,976 for breach of contract, and $1,500,000 for punitive damages.

The case was tried for some 15 days and was submitted to the jury, which returned a verdict in favor of the defendant Transamerica.

The case is replete with procedural activity on the part of the plaintiffs. Alleged error growing out of these procedural efforts, particularly the removal of the case by defendant, constitute the main contention on this appeal.

The action was originally filed in State District Court in Salt Lake City, Utah. The original complaint, although filed in state court, alleged that James DeBry was at all times, until June 1972, a citizen of the State

of Utah and resided in Salt Lake County. It also alleged that in June 1972, James DeBry moved to California for reasons not related to the lawsuit and that as of the time of the filing he was a citizen and resident of the State of California.

The defendant Transamerica Corporation was organized in Delaware, but had its principal place of business in California. Therefore, when James DeBry moved to California there was no longer complete diversity as between these parties, so at that juncture the case was not removable to federal court.

A large part of the quantity of procedure to which we have referred pertains to the existence of diversity of citizenship. In the first part of the case, James DeBry moved to California. In the last stage, he moved back to Utah. All of this revolved around the issue of diversity. On the other hand, there is a relatively small quantity of substance presented.

## II.

### PLAINTIFFS' COMPLAINTS

The fraud complained of was that Transamerica, in order to induce the plaintiffs to enter into the agreement, represented that the unregistered stock of Transamerica would automatically be free trading after a two-year waiting period; that this was false; that defendant knew that it was false; and that the plaintiffs would rely thereon.

The complaint also asserts that the undertaking of Transamerica was that if at any time within four years after the closing date (of the Exchange Contract) Transamerica would file a Registration Statement under the Securities Act of 1933 with respect to any public offering of its stock, and if Transamerica determined that it was reasonable, practicable and appropriate to include the shares of Transamerica's common stock acquired under the Agreement, then Transamerica would give 20 days notice of its intention to each of the shareholders, and on written request of one or more of the shareholders within the 20-day period, Transamerica would include the shares sold to the plaintiffs in the Registration Statement for the purpose of a public offering thereof.

Other allegations of the complaint are that:

On May 23, 1969, defendant filed an S–1 Registration Statement with the Securities and Exchange Commission (S.E.C.) "for a major registration of Transamerica's common stock, and that it was reasonable, practicable and appropriate for Transamerica to include plaintiffs' shares as acquired under the Exchange Agreement on the said Registration Statement; however, no shares of plaintiffs were included on the said May 23 Registration Statement." That as a result of the filing, they (plaintiffs) had an option to have their Transamerica shares, acquired under the Exchange Agreement, included on the Registration Statement which was to be filed on May 23, 1969.

That prior to the filing on May 23, 1969, they did not know that defendant intended to file a Registration Statement because the defendant did not give them 20 days written notice of intent to file such a statement as required by the Exchange Agreement. Instead plaintiffs were given written notice of the filing on June 6, 35 days after the notice should have been given, and 15 days after the Registration Statement was filed with the S.E.C.

That on or about June 4, defendant prepared a purported waiver for plaintiffs' signature. However, defendant fraudulently and maliciously predated the document so as to give the appearance that the document was drafted the day prior to the filing of the registration.

The defendant fraudulently induced the plaintiffs to sign the waiver; that the plaintiffs' right to have their Transamerica shares registered had a market value prior to the filing of the Registration Statement by defendant of $1,691,380, or $563,796 for each plaintiff.

The sum of $563,976 plus interest is demanded for the breach of contract, fraud and deceit; punitive damages are sought in the total amount of $1,500,000.

*The amended complaint* (first) is roughly similar to the original complaint. It carries forward the allegation that plaintiff James DeBry was at all times until June 1972, a citizen of the State of Utah residing in Salt Lake County, and that in June 1972, he moved to California for personal reasons not associated with this lawsuit and is, at the present time, a citizen and resident of the State of California.

*The second amended complaint* purports to make certain additions which amend the amended complaint. This was also filed, of course, in the Utah State District Court. It alleges the entering into of the so-called Exchange Agreement described elsewhere, which agreement exchanged the Foreign Study League, Inc. for shares of stock in Transamerica. Essentially it alleges that the registration of the shares of Transamerica, which plaintiffs received, was an important part of their agreement; that they had a contract right to have their shares of stock registered.

Further allegations pertain to the waivers they were allegedly induced to sign of a 20-day notice required by the Exchange Agreement having to do with the request to have the shares which had been traded to the plaintiffs included in the registration request made by the defendant. The plaintiffs were assured, according to the allegations in paragraph 18, that the defendants would include plaintiffs' shares in the next filing of a Registration Statement and that the defendant would undertake to obtain the registration of plaintiffs' stock two years from the date of the Exchange Agreement; that the defendant's stock was bound to increase in value and that this would cause the plaintiffs' registered stock to also rise in value. It is alleged that the plaintiffs relied on the statements and guarantees made and that by reason of the fiduciary relationship, a constructive fraud was perpetrated.

Other claims in the *second amended complaint* alleged a breach of contract arising out of waiver plus a common law fraud claim.

## III.

### DEFENDANT'S RESPONSES

The defendant's position is that in the spring of 1969, it undertook to file a Registration Statement for the shares of its restricted stock owned by one Kirk Kerkorian; that it had on May 22, 1969, given notice of that proposed registration. Plaintiffs waived, first orally and then in writing, their right to register their shares for a public offering, and they at no time requested that their shares be included in such an offering. In reliance on their waiver, the defendant filed its Registration Statement for the Kerkorian shares without including the plaintiffs' Transamerica shares.

The defendant also relies on the jurisdiction of the federal court based upon the allegation in the original complaint that the plaintiffs Robert DeBry and Lynn Hilton were citizens of the State of Utah and that plaintiff James DeBry and defendant were citizens of the State of California; that the first amended complaint left their earlier citizenship allegations unaltered; that on August 26, 1975, plaintiffs were granted leave by the State Court to amend their complaint a second time, and then in that document, for the first time, it was alleged that each of the plaintiffs is now and at all times material hereto had been a resident of Salt Lake City, Utah. Based upon the voluntary amendment of plaintiffs' jurisdictional allegations, defendant filed a petition for removal with the United States District Court for the District of Utah on August 29, 1975. Plaintiffs filed a motion to remand, and after hearing arguments of counsel, the motion to remand was denied by the U.S. District Court on October 21, 1975.

On October 23, 1975, according to the defendant's statement of the case, plaintiffs moved to amend their second amended complaint to read:

Each of the plaintiffs is now and at all times material hereto has been a resident of Salt Lake City, Utah and a citizen of the State of Utah.

An attempt was made to file a third amended complaint which, for our purposes, is of no consequence since it was rejected by the trial court.

As of the time of the pretrial conference, the claims were reduced considerably. The pretrial order describing plaintiffs' claims simply declares that: "Plaintiffs claim that defendant breached Section 5(c) of that certain contract denominated 'Plan of Reorganization and Exchange Agreement Between Transamerica Corporation and The Shareholders of Foreign Study League' dated December 6, 1968." The breach, according to the pretrial order, consisted of failure to give plaintiffs timely notice and failure to register for public sale shares of defendant's stock owned by plaintiffs, whereby the damage complained of was suffered. In response to the defendant's assertion that plaintiffs waived their rights under § 5(c) of the agreement, plaintiffs reply that such purported waivers are of no force or effect because plaintiffs were not informed of the material facts involved in the waiver, or the waiver was wholly without consideration, or defendant misrepresented or failed to disclose material facts to plaintiffs.

Defendant's claims were also reduced. The pretrial order describes defendant's claims as being that it did not breach § 5(c) of the Exchange Agreement because the conditions precedent to the assertion of any "piggy back rights" were not invoked by the plaintiffs; that the plaintiffs waived any such rights that they may have had by both written and oral waivers which were binding and valid; that no material facts were concealed or misrepresented to plaintiffs; that defendant relied on the waivers in proceeding with the so-called Kerkorian registration; and, finally, that the plaintiffs are estopped from denying the validity of such waivers.

The only issues submitted were those in the pretrial order consisting of the question whether defendant violated § 5(c) of the agreement and whether waivers signed by plaintiffs were valid.

Trial was had to a jury on May 23, 1977, and on June 8, 1977, the court granted defendant's motion for a directed verdict against plaintiff Hilton. Thereafter, the jury returned a verdict in favor of Transamerica Corporation and against the remaining plaintiffs. Plaintiffs' motion for a new trial was subsequently denied.

IV.

## DESCRIPTION OF THE ISSUES ON APPEAL

The paramount issue in the case is that of jurisdiction. Plaintiffs claim that there was no federal court diversity, whereas the defendant maintains that the case was properly removed.

Other contentions which become pertinent, only if it is ruled that there is subject matter jurisdiction and that diversity jurisdiction existed at the time required by law, include the following:

First, that the plaintiffs' constitutional right to a trial by jury was infringed because there was a disputed issue of fact with respect to the fiduciary duty between the Transamerica Corporation and the plaintiffs,

Second, that the charge to the jury was invalid in that the court engaged in repetition of several aspects of the charge and that this was prejudicial, and

Finally, that the court's directed verdict was in error.

V.

## WAS THERE A DEFICIENCY, LEGAL OR FACTUAL, IN THE REMOVAL AND HENCE THE JURISDICTION?

A. *The history of the diversity problem.*

To understand the contention of plaintiffs that the federal court did not acquire jurisdiction as a result of the removal, it is necessary to summarize the background facts insofar as they bear on the diversity of citizenship issue.

Originally the complaint was filed in the District Court of Salt Lake County. It was

plainly a state court action, a fact which was attested to in the allegation of the complaint that James DeBry was a citizen of Utah prior to June 1972, but in that month and year he moved to California "for personal reasons not associated with the lawsuit and at the present time is a citizen and resident of the State of California."

In the very next paragraph it was alleged that Transamerica was a Delaware corporation which had its principal place of business in California.[1] These allegations were superfluous to the state court suit which described generally what the plaintiffs regarded as a stock fraud transaction.[2]

In the first complaint the status of the jurisdiction situation as of March 1974 was that although there might have been partial diversity since two of the plaintiffs were residents of Utah, the diversity of the plaintiffs was not complete as required by law.

The first amended complaint continued the situation that was described in the original complaint. The first amended complaint was filed in July 1974.

In August 1975, plaintiffs filed the second amended complaint in the State District Court. An allegation was contained in that document that James DeBry, the plaintiff who had moved to California, had now returned to Utah. It said that he had changed his residence. The statement continued that "Each of the plaintiffs is now and at all times material hereto has been a resident of Salt Lake City, Utah." Within a few days after the filing of this complaint containing the just-mentioned statement regarding James DeBry's change of residence, the petition for removal was filed by defendant on August 28, 1975.

The next incident relevant to the jurisdiction was the federal court pretrial conference. The pretrial order is dated February 22, 1977. Federal court jurisdiction, as far as the parties were concerned, had become an accepted fact at least according to the pretrial order. It was stipulated to and was signed by lawyers for both sides. It contained the statement that jurisdiction of the court was invoked under diversity of citizenship and that "the jurisdiction of the court is not disputed and is hereby determined to be present."

Plaintiffs-appellants now maintain that in order to have federal jurisdiction, full diversity had to exist both at the time of the filing of the action and at the time of the filing by defendant of its petition for removal. Plaintiffs show acquaintanceship with § 1446(b) of the Judicial Code, which provides as follows:

If the case stated by the initial pleading is not removable, a petition for removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable.

They argue, however, that this 1949 amendment by Congress does not mean what it says, that is, it does not allow the defendant to remove the case to the federal court as a result of the return of James DeBry.

First, they say that James DeBry did not become a citizen of Utah when he returned; that the second amended complaint revealed that the plaintiffs were all residents of Utah and that it did not mention citizenship. This argument is at variance with the motion for leave to amend by interlineation filed by the plaintiffs through their present counsel:

4.

Each of the plaintiffs is now and at all times material hereto has been a resident of Salt Lake City, Utah *and a citizen of the State of Utah, except only that plain-*

---

1. It is surprising that the plaintiff in a state court action would allege facts establishing state court and not federal court jurisdiction. A question comes to mind at the very outset whether plaintiffs at the time were seeking to avoid federal court jurisdiction.

2. The only purpose that the allegation could have had was to advise the defendant that there was no diversity.

tiff James DeBry was a resident of the State of California during the period from on or about July 1, 1972 to on or about the 2nd day of August, 1974.

This was filed October 24, 1975, as noted. In the second amended complaint filed in August 1975, there was an allegation that James DeBry, the plaintiff, who had moved to California, had now returned to Utah. He said that he had changed his residence. The statement continued that

Each of the plaintiffs is now and at all times material hereto has been a resident of Salt Lake City, Utah.

This statement activated the filing by defendant Transamerica of the motion for removal on August 28, 1975, within the 30 days required by § 1446(b).

Second, the plaintiffs say that defendant neglected to file within 30 days after receiving notice in accordance with § 1446(b), the statute quoted above.

A third argument is that in order for the statute to apply in a diversity action, to remove the cause subsequent to original filing, federal jurisdiction must have been present in the case not only at the removal stage of the proceedings but also when the cause was originally filed. The plaintiffs do not seek to furnish any rationale as to the meaning or as to the effect of the 1949 amendment, but in essence their argument is that it had no effect on a removal subsequent to the original filing of a case, such as that which occurred in the present one.

It is true that ordinarily the significant time for determining the presence or absence of diversity jurisdiction is the date that the original complaint is filed. It is hornbook law that if diversity jurisdiction existed between the parties at the time of the action, it continues to exist and is not subject to being defeated because one of the parties later becomes a citizen of the same state as his opponent, and, similarly, if there was no diversity when the action was commenced, it is impossible to create it by a change of domicile by one of the parties or other subsequent event. Appellants would have us apply this theory even in the case of removal and regardless of § 1446(b), *supra*. We disagree.

B. *Construction of Section 1446(b).*

If § 1446(b) were to be given effect in accordance with its terms, removal would be an occasion for redetermining the diversity jurisdiction. There has been, however, a reluctance to give this section literal effect. This is perhaps the result of apprehensions that manipulations to obtain or defeat jurisdiction would result. To say, however, that it can only apply where jurisdiction existed at the time of filing and continued at the time of motion for removal would render it meaningless, for if jurisdiction was present at the start, the after-filing removability would not occur as a result of a judgment of the court or the other factors that are set forth in the statute. So it is not possible to give effect to all of the statute's terms and also accept fully the arguments of the plaintiffs here.

The view which we adopt is that while the statute does not open the door widely to removal following a change in the status of the parties, that it does allow removal under certain conditions including that which is present in the case at bar.

According to 14 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3732, at 726–27 (1976), there are special conditions which justify the exercise of the removal authority or power, and examples are given as follows:

This provision, added in 1949, codifies prior holdings that the period for filing the removal petition will be extended or renewed at the time when a case that did not seem to be removable at first later becomes or is discovered to be removable. This transformation may occur in a number of ways. *Plaintiff may amend the initial pleading to include a claim for relief within the jurisdiction of the federal courts*, such as a federal claim or a separate and independent claim that is removable. Or *plaintiff*—or events beyond plaintiff's control—*may increase the amount in controversy to the requisite jurisdictional level. Moreover, a change in parties, such as plaintiff's voluntary*

*dismissal of those defendants whose presence destroyed diversity, may make the action removable. Plaintiff also may reveal the citizenship of or residence of the parties, when that was previously unknown.* In a number of cases removal of an arbitration proceeding has been permitted when one of the parties initiated a state court proceeding and the requirement of a "civil action brought in a State court" was first met at that time. (Emphasis added)

In our case the special condition justifying the removal is the revelation by plaintiff in the second amended complaint that the residence of one of the plaintiffs had changed. There was no occasion for this allegation except to provide an update to the previous allegation that James DeBry was a resident of California. He had, of course, always been a resident of Utah, as far as we know, before he moved to California for a period of some two years coincident with the filing of this lawsuit.

Professor Wright in his hornbook, *Law of Federal Courts*, at 151–53 (3d ed. 1976), makes the point that where the defendant is engaged in manipulation in order to gain the removal, the § 1446 amendment cannot operate to bring about a removal.[3] On the other hand, where the plaintiff, by *voluntary* action, changes the situation, such as by dismissing a non-diverse defendant to bring about a diversity situation, the statute does apply. We regard that condition, like the one mentioned in the quote from Wright, Miller & Cooper (the revelation of citizenship or residence of the parties when it was previously unknown), to be the proper guide to follow in seeking a meaning for the § 1446 amendment.

Professor James Moore in his treatise also takes the position that in order for the amendment to apply it must come about as a result of a voluntary act on the part of the plaintiff. *See* 1A Moore's Federal Practice ¶ 0.168[3.–5], at 487 (2d ed.).

The voluntary-involuntary test originated some years ago apparently in *Powers v. Chesapeake & Ohio Ry.*, 169 U.S. 92, 18 S.Ct. 264, 42 L.Ed. 673 (1898). What it requires is a voluntary act of the plaintiff which effects a change rendering a case subject to removal (by defendant) which had not been removable before the change. In *Powers*, there was not complete diversity at the time the case was filed in state court. The change brought about by the plaintiff was discontinuance of the state court proceedings as to the non-diverse defendants. As a result, there was complete diversity. The Supreme Court ruled that in these circumstances, removal was permissible once the diversity was complete. Hence, the plaintiff's delay in dismissing the non-diverse defendants did not impede the removal.

The voluntary-involuntary test has become well accepted. It was in *Whitcomb v. Smithson*, 175 U.S. 635, 20 S.Ct. 248, 44 L.Ed. 303 (1900), that the Supreme Court ruled that a cause did not become removable when the non-diverse defendant remained in the case until a directed verdict was ordered by the state court. This was a ruling on the merits which was not initiated by the plaintiff nor approved by the plaintiff. It was adverse to the plaintiff.

There are not too many recent decisions on this, but the two circuits which have dealt with the question since the 1949 amendment have applied the voluntary-involuntary test. *Self v. General Motors Corp.*, 588 F.2d 655 (9th Cir. 1978); *Weems v. Louis Dreyfus Corp.*, 380 F.2d 545, 548

---

**3.** Our court in *Dodd v. Fawcett Publications, Inc.*, 329 F.2d 82 (10th Cir. 1964), had occasion to consider the validity of post filing removability of a case. This was an action by Oklahoma University football players against a publication, *True* magazine, which contained an article entitled "The Pill That Can Kill Sports." Reference was made to the 1956 University of Oklahoma varsity football team, whereby 13 members alleged that the article was libelous per se.

Along with Fawcett Publications, Inc., which was a diverse defendant, was joined a distribution company called Mid-Continent, a Delaware corporation with its principal place of business in Oklahoma. It was determined that this was a manipulative joinder to prevent removal to the federal court, and on this basis it was ruled that the jurisdiction being exercised by the United States District Court for the Western District of Oklahoma was valid.

(5th Cir. 1967). The cited cases dealt with removability which came about after the initial pleading. The general effect of the test is that a cause cannot be removed where the removability is a result of some development other than a voluntary act of plaintiff. *See Self, supra.* The cause cannot be removed as a result of evidence from the defendant or the result of a court order rendered on the merits of the case. In the *Self* case removal was denied because the diverse situation resulted from the order of the court, a decision on the merits. Since the plaintiff had not dismissed or discontinued the suit against the non-diverse defendant, removal was not in order. The Ninth Circuit rejected the notion that finality of state court proceedings was the basis for the rule since exhaustion of the appellate process in the state courts would not ordinarily be expected to make a case removable as to the remaining defendants.

The Fifth Circuit in *Weems* ruled that dismissal by directed verdict, being involuntary as to the plaintiff and also nonconclusive since it was appealable, did not satisfy the voluntary-involuntary test, so removal was denied.

█ The controversy that is apparent in the decisions exists in situations in which the plaintiff has not acted voluntarily to set in motion the condition which causes the case to become removable. Where the plaintiff has acted voluntarily, the Supreme Court rule in *Powers, supra,* allows a case to be removed. Inclusion in the second amended complaint of the statement that all plaintiffs were residents of Utah at all material times under the heading of jurisdiction describes a voluntary condition originating with plaintiff. Under the decided cases it does not operate to bar removal if, of course, application for removal was made within the 30 days provided by the 1949 amendment to § 1446(b). In the case at bar the time requirement was met. Also, this voluntary act of the plaintiffs was unequivocal notice to the defendant that the situation had changed.

It is logical to conclude, from a reading of the mentioned treatises, that the underlying policy problem is avoidance of manipulation of a jurisdictional change by a defendant. Obviously the defendant in our case, although he acted to remove very quickly once the notice was given, had nothing to do with creating the condition that gave rise to the removal. It was the plaintiff's act which gave rise to the removal.

## C. Did the deposition of DeBry constitute prior notice?

We conclude that it did not.

█ The main argument of the appellants on this appeal is that there was not a proper compliance by appellees with the § 1446(b) amendment in that the notice had been previously received by the defendant-appellee a few months prior to the filing of the second amended complaint and during the taking of the deposition of James DeBry, and that the 30-day limitations provision for instituting removal had passed. In the DeBry deposition he stated that he had moved from Utah to California prior to the filing of the suit and that he had moved back to Utah after the filing of the suit, but this did not constitute, as we view it, a voluntary notice of change of domicile. When we say that the first actual notice was in the amended complaint, we are not taking the position that a deposition is incapable of furnishing notice. We merely say that this deposition, which is set forth in Judge McKay's dissent, was not an adequate notice for the reasons first, that it was not voluntary, and, secondly, that it was reluctant and evasive.

The trial court did not consider the deposition as notice. It was the second amended complaint that the trial court treated, together with the happenings at the pretrial as notice. This is reflected in the trial court's pretrial order which found that on the basis of agreement between counsel, diversity then existed.

Mr. DeBry was noncommittal regarding a change of residence or citizenship and did not say that he had permanently moved. In it he gave as little information as he could and so the position we take is that

this was inadequate notice, and had the removal been taken at this time, it probably would not have stood up.

Section 1446(b) uses the word "ascertained" in connection with the giving of notice. Webster's New Collegiate Dictionary (1975), defines the term "ascertain" as "to find out or learn with certainty." Given that the deposition might have placed the person on inquiry, it was not sufficient to permit him to learn with certainty.

The second amended complaint, on the other hand, said

Each of the plaintiffs is now and at all times material hereto has been a resident of Salt Lake City, Utah.

Was this not designed to herald the return of DeBry to Salt Lake City, or was it merely intended to tease the defendant so as to cause it to make a move such as it made in pursuing the diversity jurisdiction? The trial court felt that it was for real, so to speak, because the judge wrote:

Each of the plaintiffs is now and at all [times] material hereto has been a resident of Salt Lake City, Utah and a citizen of the State of Utah.

The judge must have had reason to believe that James DeBry had moved back to Salt Lake City on a permanent basis.

This court has spoken on the subject of construing a predecessor provision of § 1446(b) in the case of *Ardison v. Villa*, 248 F.2d 226, 227 (10th Cir. 1957). There the court, speaking through Judge Murrah, said:

The manifest purpose of starting the period for removal from the date of the service of the "initial pleading" is to enable the defendant to intelligently ascertain removability from the fact of such initial pleading, so that in his petition for removal, he can make a " * * * short and plain statement of the facts which entitled him or them to removal * * *" as required in 28 U.S.C. § 1446(a). This much is made certain by the second paragraph of Subsection 1446(b) providing: "If the case stated by the initial pleading is not removable, a petition for removal may be filed within twenty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." This construction of the statute is in harmony with most of the adjudicated cases.

Thus, this court has held that the purpose of the starting of the period of the limitations is important to allow the defendant to intelligently ascertain removability so that in his petition for removal he can make a simple and short statement of the facts. If the statute is going to run, the notice ought to be unequivocal. It should not be one which may have a double design.

Other cases have enunciated the requirement of ability to ascertain intelligently. See *First National Bank in Little Rock v. Johnson & Johnson*, 455 F.Supp. 361, 362 n.1 (E.D.Ark.1978), which says:

the plain purpose of the rule is to permit the removal period to begin only after the defendant is able to ascertain intelligently that the requisites of removability are present. See *Ardison v. Villa*, 248 F.2d 226, 227 (10th Cir. 1957). Therefore, the oral motion of plaintiffs and the trial court's oral order granting the motion, on the record, certainly must be that sufficient notice with which the statute is concerned.

The plain purpose of the rule is, then, to permit the removal period to start only after the defendant is able to ascertain intelligently that the requisites of removability are present. Therefore, a voluntary motion on the part of the plaintiffs and the trial court's order granting the motion ought to be sufficient notice within the statute. See also *Perimeter Lighting, Inc. v. Karlton*, 456 F.Supp. 355, 358 (N.D.Ga. 1978); *French v. Banco Nacional De Cuba*, 192 F.Supp. 579, 580 (S.D.N.Y.1961); *Minkoff v. Budget Dress Corp.*, 180 F.Supp. 818, 825 (S.D.N.Y.1960). In *Perimeter Lighting, Inc. v. Karlton, supra*, the court said:

the initial pleading must be such that the defendant can intelligently ascertain removability from its face.

Most of the cases have applied this to an initial pleading, but this is not to say that it does not apply to other pleadings and documents. The construction of § 1446(b), which the cases endorse, that is a construction which will communicate the change, is a sensible way to read it. It should not be an ambiguous statement that requires an extensive investigation to determine the truth.

In sum, the motion to remove by the defendant was filed following the first positive notice given. After that, a 15-day trial was had and the plaintiffs were perfectly willing to go through it feeling that there might be a reserve escape hatch if they lost. Neither the law nor the equities of the situation argue in favor of allowing such an escape.

## VI.

### WAS THE JURY CHARGE PREJUDICIAL TO APPELLANTS?

■ This argument complains that the trial court repeated specific parts of its charge and seeks to predicate reversal on this element alone. We have read the charge. Contrary to what counsel says, the charge was extensive and very detailed and also extremely careful. It is said that the court repeated the words "clear and convincing" 13 separate times.

General authorities which condemn repetition, such as E. Devitt & C. Blackmar, Federal Jury Practice and Instructions (1970), are relied on. The briefs quote Devitt & Blackmar's statement that care must be taken by the court to avoid undue emphasis on particular portions of the charge, and not to omit portions that are necessary for an understanding of the whole. This, of course, does not pointedly support the contention that repetition alone constitutes reversible error. The specific statement from Devitt & Blackmar says that the court is not obligated to give repetitive instructions and ordinarily should not do so. This statement falls far short of saying that it was error.

Finally, the brief contains the following statement:

Plaintiffs cannot, of course, prove that the repetitions prejudiced their cause. One wonders why they were mentioned then. The repetitions given by the court were, first, in passing during introductory remarks and, secondly, in the definition of what "clear and convincing" was and how it applied to the case at bar. There was not any monotonous repetition capable of mesmerizing the jury. We find no merit in this contention.

## VII.

### DID THE TRIAL COURT VIOLATE THE PLAINTIFFS' RIGHT TO A TRIAL BY JURY AS A RESULT OF RULING AS TO THE SCOPE AND EFFECT OF ISSUES TO BE TRIED?

■ The initial response to the contention of the plaintiffs must be that there is not an absolute right to have every issue raised submitted to the jury. The Constitution does not compel this. It calls for the submission of bona fide fact questions to the jury, so the only valid argument in this area is whether the court committed error in dealing with the issues, for it is not apparent that a violation of the plaintiffs' constitutional rights with respect to the Seventh Amendment has occurred.

■ Basically the plaintiffs maintain that a corporation owes a fiduciary duty to each of its shareholders and that this corporation, due to its special undertaking, owes such a duty. It is true that the existence of fiduciary duty was framed as a fact question in the pretrial order, but this is far from conclusive. This is a tentative appraisal and it does not bind the court forever after to treat this as a constitutional question. The trial judge has a discretion to modify or even exclude submissions to the jury based upon the shape and content of the evidence, and that is the outside limit of possible error in this case.

It is essential that we be mindful that although various kinds of fraud were alleged and argued in this trial, when the explosives of the trial were completed and

an effort was made to find an issue worthy of going to the jury, the case was reduced to one in breach of contract.

The issue submitted to the jury in the court's charge was whether the defendant breached paragraph 5(c) of a certain written contract between the defendant and the plaintiffs. Paragraph 5(c) sets up a conditional undertaking on the part of the defendant Transamerica to obtain the registration of the plaintiffs' shares of Transamerica's stock in conjunction with registering Transamerica's stock, but this is stated as a strictly conditional undertaking. The first condition is if Transamerica undertakes to file a registration statement under the Securities Act of 1933, and the second condition is "if Transamerica shall determine that it is practicable and appropriate to include therein the shares of Transamerica's common stock, acquired by the Shareholders under this agreement, which affirmative determination shall not be unreasonably withheld . . . ."

So the undertaking to give plaintiffs notice of intent depends on whether the decisionmakers of the defendant decide that it is practicable and appropriate to include the plaintiffs' shares. It is also subject to "provisions of subparagraph 2(p) hereof, on written request of one or more of the Shareholders within said twenty day period . . . ." Finally, it is subject to the decision of counsel for Transamerica that an exemption from registration under the Securities Act of 1933 is not deemed available.

This whole thing is complicated by the fact that waiver of any notice was agreed to subsequently by the plaintiffs. There is an issue, of course, as to whether the plaintiffs were defrauded into waiving notice under the contract provisions in subsection 5(c).

The court's charge goes on to say that the defendant maintains that it did not violate the provisions because it gave the plaintiffs 20 days notice by telephone of intention to undertake a registration and that the registration did not become final and effective until June 17, 1969, and that the plaintiffs did not request to be included. The charge continues that defendant also contends that the plaintiffs waived both orally and in writing their right to register their shares for a public offering and any right which they may have had to include their stock in the registration effort. So one is amazed that this cause would go to the jury in any event since it is based on a provision of a contract that is highly equivocal and very difficult to violate.

The trial court ruled that Transamerica, in deciding whether the shares of plaintiffs were to be included in the SEC submission, was only required to have before its decisionmakers all information relevant to the submission and inclusion of the plaintiffs. The plaintiffs, through their counsel, stated that it was the obligation of Transamerica to make disclosures to the plaintiffs in accordance with the relationship and that this should be weighed by the jury. The court rejected the position of plaintiffs that Transamerica was obligated to disclose all material facts which plaintiffs would reasonably look to and rely upon in the circumstances. The court said that it would not go that far because that establishes a special fiduciary relationship. The court said that the jury was entitled to consider the relationship which actually existed. The court added: "It may be one in which it induces belief in what is represented, not what they may have to tell him by way of the Kerkorian deal or what the market is likely to do or anything of that kind."

Our reaction is that there is no magic in the term "fiduciary relationship" in any event so that the trial court's rejection of that phrase is not significant since the charge detailed the theory of duty based upon the relationship and the circumstances. The court in doing this was not passing on the factual issue or making a finding. It was merely deciding a legal question and it was a proper choice and certainly it did not violate the Seventh Amendment to the Constitution of the United States. In its charge the court said:

In determining what material facts plaintiffs may reasonably have looked to and relied upon you may consider the

relationship between Transamerica and plaintiffs. You may consider whether Transamerica held a position, which by reason of employer-employee relationship would have an effect upon the extent upon which reliance was placed upon the statements which were made or not made as the case may be in connection with the proposed registration. . . . And whether or not in terms of the relationship which existed between them, the plaintiffs were justified in placing trust and confidence in manner which they claim in Transamerica. You may also consider and weigh all other aspects and factors of the relationship between Transamerica and the plaintiffs which you find important as to whether plaintiffs relied upon them.

The court did not stop here. In many of its instructions it commented on the relationship between Transamerica and plaintiffs including the duty owed by Transamerica. One statement the court made was "Transamerica was at all times duty-bound not to act in opposition to the interests of the plaintiffs, not to serve any private interests of its own in opposition to plaintiffs' interests."

■ The above comments emphasize that the trial court was fully cognizant of plaintiffs' theory of the case and made a conscientious effort to interpret it and bring it to the attention of the jury in its simplest possible terms so that if there was a violation on the part of Transamerica, the jury could so find.

As we view it then, the failure to couch it in terms of fiduciary duty had no significance.

Finally, the contract provision itself was very unsatisfactory from the standpoint of the finding. It was so very vague and undemanding that it is understandable that the jury was not impressed with the contention of the plaintiffs that there had been a violation of their undertaking.

We conclude that the trial court was careful in its definition of the issues and that the plaintiffs were not deprived of an organic right. Indeed there is no showing that the trial court abused its discretion in defining the issues and submitting them to the jury.

## VIII.

### WHETHER THE TRIAL COURT ERRED IN DENYING PLAINTIFFS' MOTION TO FILE A THIRD AMENDED COMPLAINT

■ We hold that it did not. Plaintiffs were allowed to file an original complaint followed by a first amended complaint and a second amended complaint. Plaintiffs were given leave to amend the jurisdiction paragraph by interlineation. The question is whether the trial court abused its discretion. We must conclude that good reason existed for the denial.

First, the case had been on file for eighteen months. The trial setting was three months off. The tendered complaint brought in new concepts and theories which created a hazard that postponement of trial would be necessary. The court reasoned that:

The interests of fairness and justice to both parties are best served at this stage of the case by avoiding the additional discovery and trial preparation which the different causes of action would require. The additional causes of action which the plaintiffs seek to include by this amendment do not represent new areas of the law that could not have been developed further and incorporated into this cause of action at an earlier date.

It would thus appear that the trial court was of the opinion that there had been ample time for the plaintiffs to develop the concepts and theories embodied in the amended complaint since they did not represent new areas of the law. It cannot be said, therefore, that the trial court acted in an unreasonable or arbitrary manner. The original complaint after all did allege a breach of fiduciary duty.

Admittedly leave to amend is to be given freely, but this does not mean that it can go on indefinitely.

The action of the court was proper.

## IX.

## WHETHER IT WAS ERROR TO DIRECT A VERDICT ON THE CLAIMS OF PLAINTIFF HILTON

■ The contention of the plaintiffs on this was that the 25% limitation with respect to the sale or other disposition of the stock as contained in paragraph 2(p) of the Exchange Agreement was not violated by the plaintiff Hilton and the court was therefore in error in holding that the 25% transfer was at odds with the Exchange Agreement.

What Hilton did was to convey in excess of 25% of his Transamerica stock to a revocable trust for his children. He conveyed to other entities as well.

Paragraph 2(p) provides as follows:

Each of the Shareholders represents and warrants to Transamerica that the Transamerica common stock to be acquired by him in the exchange provided for in this agreement will be acquired by him for his own account for the purpose of investment and not with a view to resale or other disposition of all or any portion thereof, and that in order to protect the accounting treatment of this transaction as a pooling of interest he will not, without prior written approval of Transamerica, within one year following the Initial Closing Date, as hereinafter defined, voluntarily sell or otherwise dispose of more than a 25% interest in the shares delivered to him on the Initial Closing Date, as hereinafter defined, pursuant to the provisions of subparagraph 1(a) hereof.

So the prohibition is against "selling" or "otherwise disposing of." The legal argument made is the doctrine of *ejusdem generis* which applies to a construction of the words "sell" or "otherwise dispose of." This means that "sell" and "otherwise dispose of" are the same. We, however, take the view that "otherwise dispose of" adds to the term "sell." These words are not even close to being synonymous. "Sell" is a specific term that connotes that the property in question was transferred to another for money or its equivalent. "Otherwise dis-

posed of," on the other hand, covers most any kind of a transaction in which the individual in question passes on ownership to someone or some entity. This would include gifts.

Hilton certainly transferred the shares. A very large proportion of Hilton's stock was passed on to trustees and to other entities including Zions First National Bank, which caused a transfer of the stock out of Hilton's name and into the name of Zions' nominee, Bryce & Co. Hilton retained only a small percentage of his shares. The contractual requirement that, as the buyer of the stock, he did not voluntarily "sell" or "otherwise dispose of" more than a 25% interest in the shares delivered to him on the initial closing date, was violated. Violation of the agreement relieved Transamerica of any obligation to register the shares.

As we have shown above, the trial court found and determined that paragraph 2(p) of the agreement had been violated.

Accordingly, we believe that the trial court acted correctly in granting the directed verdict.

The judgment of the district court is affirmed.

McKAY, Circuit Judge, dissenting:

Today's labor is over one of the niceties of civil procedure—the removability of actions to federal court. Removability was admittedly impossible when the action was originally filed in Utah state court. At that time, the complaint identified plaintiff James DeBry as a citizen of California, Transamerica's principal place of business. Subsequently, however, James DeBry moved to Utah, and revealed this fact to Transamerica in an April 1975 deposition. Some four months later the complaint was amended to state that each plaintiff "is now and at all times material hereto has been a resident of Salt Lake City, Utah." Appendix, vol. 12, at 31. Relying on 28 U.S.C. § 1446(b), Transamerica immediately sought, and obtained, removal to federal court. Although the appellants contested

the correctness of removal in a pretrial proceeding,[1] the federal district court declined to remand the action. It is the propriety of these procedures which divides me from the majority.

The majority may be correct in favoring application of 28 U.S.C. § 1446(b) to cases involving a diversity-creating relocation by a plaintiff which occurs subsequent to the initial filing of the suit. Even if this application is correct in principle, I do not think the principle applies in this case. In my view, it was not apparent from the second amended complaint that diversity jurisdiction existed. Diversity jurisdiction depends on the citizenship of the parties, not on where they happen to reside.[2] But the complaint relied on to support removal referred only to residency. Inasmuch as the second amended complaint does not indicate that James DeBry had changed his citizenship to Utah, I believe it was insufficient to justify removal.[3]

Even if the statement about residency can somehow be regarded as sufficient to indicate the existence of diversity jurisdiction, the defendant should have been prevented from obtaining removal by the terms of section 1446(b). That section provides:

[A] petition for removal may be filed *within thirty days* after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or *other paper* from which it may *first* be ascertained that the case is one which is or has become removable.

(Emphasis added). Several courts have treated a discovery paper as an "other paper" for purposes of the statute. *See, e.g., Fleming v. Colonial Stores, Inc.,* 279 F.Supp. 933 (N.D.Fla.1968); *Camden Industries Co. v. Carpenters Local Union No. 1688,* 246 F.Supp. 252, 255 (D.N.H.), *aff'd,* 353 F.2d 178 (1st Cir. 1965); 1A *Moore's Federal Practice* ¶ 0.168 [3.–5], at 489 n. 41 (2d ed. 1974). This seems to be an eminently sensible view, and it is not one disputed by the majority. Relying on the James DeBry deposition as just such an "other paper," the appellants contend that it contained as much diversity-establishing information as did the second amended complaint. If the second amended complaint could have supported removal, the argument continues, then the deposition could have done so as well. But the failure of Transamerica to seek removal until four months after deposing James DeBry ran afoul of section 1446(b)'s thirty day limitation, thus barring removal. The majority avoids this result by discerning ambiguities in the deposition testimony of James DeBry. It is enlightening to examine the deposition testimony itself.

The deposition testimony of James DeBry may well have been uncertain as to some subjects, but it was not as to residency:

A. . . . My name is James DeBry, capital D–E–B–R–Y. That's James De-Bry.

Q. *What is your residence address?*

**1.** Appendix, vol. 11. The hearing on appellants' motion to remand took place on October 20, 1975, nineteen months before trial. Counsel for appellants expressed the concern that the court's refusal to remand ultimately would necessitate a second trial in state court. *Id.* at 25, 26.

**2.** An allegation of residence alone is insufficient for purposes of establishing diversity jurisdiction. *Realty Holding Co. v. Donaldson,* 268 U.S. 398, 399, 45 S.Ct. 521, 69 L.Ed. 1014 (1925); 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3611, at 705–06 (1975). An older decision of this circuit recognized an exception when the record showed that the averment of residence was intended to implicate citizenship. *Kelleam v. Maryland Cas. Co.,* 112 F.2d 940, 943 (10th Cir.

1940), *rev'd on other grounds,* 312 U.S. 377, 61 S.Ct. 595, 85 L.Ed. 899 (1941). The *Kelleam* decision was discussed by us in *Whitelock v. Leatherman,* 460 F.2d 507, 514 n. 14 (10th Cir. 1972).

**3.** The fact that the reference to residency appeared under a jurisdiction caption is not consequential. In this connection, it should be remembered that the second amended complaint was filed in *state* court. Inasmuch as diversity pleading is not meaningful in the state court context, it is far from clear that a state court averment of residency—which may be relevant to the application of a long arm statute—can reasonably be regarded as intending to implicate citizenship as well.

A. *777 East South Temple, Apartment 9–E.*

Q. Do you have an office address?

A. No.

Q. When did you move to California from Salt Lake?

A. Moved to California—it will be three years ago, so that will be '72, then. We moved to California the first part of July of 1972.

Q. And where did you live in California?

A. In Rancho Bernardo. That's about twenty miles north of San Diego.

Q. *And when did you return to Salt Lake?*

A. I know I'm not supposed to volunteer but after I got to California we did move once about three miles from there into another home in the same area known as Green Valley.

*We returned in August of last year and purchased a unit here* so we were gone about two years and one month living in California.

Q. *You returned in August of 1974?*

A. 1974, uh-huh.

Q. Do you recall approximately what date?

A. Yes. I think it was around the 2nd or 3rd of August.

Q. Of 1974?

A. Yes, uh-huh.

Record, vol. 13, at 3–4 (emphasis added).

I am quite willing to concede that the deposition testimony was inarticulate regarding DeBry's *citizenship,* but it was no more ambiguous on this question than was the second amended complaint. As already noted, the second amended complaint was absolutely silent on the subject of DeBry's citizenship: Both "papers" referred to residency only. Nonetheless, the majority concludes that the second amended complaint was sufficient to support removal while the deposition was not. I do not think the majority's analysis is consistent. If references to residency are sufficient to support removal, then Transamerica should have sought federal jurisdiction within thirty days of deposing James DeBry. But if the silence of the deposition on the citizenship question prevented removal under section 1446(b), then the similar muteness of the second amended complaint should have barred removal.

I would dismiss for lack of federal subject matter jurisdiction and order the case remanded to state court.