*Marshall, Ch. J.,
 

 delivered the opinion of the court, as follows:— The Manhattan, a neutral ship, while prosecuting the voyage insured, was captured by a belligerent cruiser, the second mate and twenty-one of the hands were taken out, and two British officers and fifteen seamen put on board, and she was ordered into a British port. The mate soon afterwards arrived in the United States, in another vessel. On the 26th of February 1805, he gave information of these facts to the owner of the Manhattan, who, on the 28th of the same month, communicated it to the insurers, and offered to abandon to them. On the 2d of April, payment of the freight was demanded and refused. The Manhattan was carried into Bermuda, and libelled as prize of war. On the 20th of April, in the same year, both vessel and cargo were acquitted. From this sentence, so far as respected the cargo only, an appeal was prayed, which does not appear to have been decided. The cargo was delivered to the owners, on their giving security, and on the 8th of July, the vessel and cargo arrived at the port of destination. The underwriters having refused to give counter-security, this action was brought, on the 6th of June, after the vessel was liberated, and before her arrival at the port of destination. The policy is on the freight.
 

 The question referred to this court is, whether the facts stated entitle the insured to recover against the underwriters for a total loss. In examining this question, the material points to be determined are : 1st. Had the insured a right to abandon when the offer was made ? 2d. Have any circumstances
 

 since occurred which affect this right ? These are important questions to the commercial interest of the United States, and ought to be settled with as much clearness as the case admits.
 

 *It is universally agreed, that to constitute a right to abandon, there must have existed a total loss, occasioned by one of the perils insured against; but this total loss may be real or legal. Where the loss is real, a controversy can only respect the fact; but the circumstances which constitute a legal, or technical loss, yet remain, in many cases, open for consideration. It has been decided, that a capture, by one belligerent from another, constitutes, in the technical sense of the word, a total loss, and gives an immediate right to the assured to abandon to the insurers, although the vessel may afterwards be recaptured and restored. It has also been decided, that an embargo or detention by a foreign friendly power, constitutes a total loss, and warrants an immediate abandonment. But the capture, or taking at sea of a neutral vessel by a belligerent, is a case on which the courts of England do not appear to have expressly decided, and which must depend on general principles, on analogy, and on a reasonable construction of the contract between the parties.
 

 A capture by an enemy is a total loss, although the property be not changed, because the taking is with an intent to deprive the owner of it, and because the hope of recovery is too small, and too remote, to suspend the right of the assured, in expectation of that event. If a neutral ship be captured as enemy-property, the taking is, unquestionably, with a design to deprive the owner of
 
 it;
 
 and the hope of recovery is, in many cases, remote, since it
 
 *27
 
 may often depend on an appellate court; and though not equally improbable as in the case of capture by an enemy, is not so certain, as is stated in argument by the counsel for the defendants. The distinction between a capture by an enemy and by a belligerent, not an enemy, has not been taken in the cases adjudged in England, so far as those cases have been laid before the court, and the best general writers seem to arrange them in the same class. 2 Marshall 422, 435. *It has been also determined, that a total loss p . existed in the case of an embargo, or the detention of a foreign *- prince.
 

 In one case cited at the bar
 
 (Saloucci
 
 v.
 
 Johnson),
 
 the court of king’s bench determined, that an illegal arrest at sea, amounted to a detention by a foreign prince, and although that case has since been overruled in England, so far as it decided, that to resist a search did not justify a seizure, yet the principle that an arrest at sea was to be resolved into a detention by a foreign power, has not been denied. Marshall (p. 435), after noticing the contrary decisions respecting the right of a neutral to resist a search, adds, “ yet the above case of
 
 Saloucci
 
 v.
 
 Johnson
 
 may, nevertheless, I conceive, be considered as an authority to prove, that if a neutral ship be unlawfully arrested and detained by a belligerent cruiser, for any pretended offence against the law of nations, this would be a detention of princes.” That a detention of a foreign power by embargo, or otherwise, warrants an abandonment, is well settled. 2 Marshall 483.
 

 The opinion given by the court of king’s bench in the case of
 
 Saloucci
 
 v.
 
 Johnson, goes
 
 no further than to establish that an unlawful arrest at sea is to be considered as the detention of a foreign prince. Whether the arrest can only be considered as unlawful, when the cause alleged, if true, is not in itself sufficient to justify a seizure, or when, if true, it would be sufficient, but is in reality contrary to the fact, is not stated. In point of reason, however, it would seem, that when an arrest is made at sea, by a person acting under the authority of a prince, the detention is as much the detention of princes in the one case as in the other.
 

 In the case of an embargo, the detention is lawful. The right of any power to lay an embargo has not been questioned. Yet it is universally admitted, that an embargo constitutes a detention, which amounts, at the time, to a total loss, and warrants an abandonment. *In what consists the p.. difference between a detention occasioned by an embargo, and a de- [*44 tention occasioned by an arrest at sea, of a neutral, by a belligerent power ? An embargo is not laid with a view to deprive the owner of his property, but the arrest is made with that view. In the first case, therefore, the property detained is not in hazard ; in the last, it always is in hazard. So far the claim to abandon on an arrest is supported by stronger reason than the claim to abandon, when detained by an embargo.
 

 But it is argued, that the duration of an embargo has no definite limitation, while a neutral vessel may count on being instantly discharged. Such is the rapidity of proeeeeding in a court of admirality, that its mandate of restoration is figuratively said to be “borne on the wings of the wind.” Commercial contracts have but little connection with figurative language, and are seldom rightly expounded by a course of artificial reasoning. Merchants generally regard the fact itself ; and if the fact be attended to, an embargo seldom continues as long as the trial of a prize cause, where an ap
 
 *28
 
 peal is interposed. The history of modern Europe, it is believed, does not furnish an instance of an embargo of equal duration with the question whether the cargo of the Manhattan be or be not lawful prize. The reasoning of the books in the case of a capture by an enemy, and of an embargo, applies in terms, but certainly in reason, to an arrest by a belligerent, not-an enemy. 2 Marshall 483.
 

 The reasoning of the English judges, in all the cases which have been read at bar, and their decisions on the question of abandonment, have received the attention of the court. To go through those cases, would protract this opinion to a length unnecessarily tedious. With respect to them, therefore, it will only be observed, that the principles laid down appear to be applicable to an arrest, as well as to a capture or detention of foreign powers; and that a distinction between an arrest and such capture or detention, has never been taken.
 

 *The contract of insurance is said to be a contract of indemnity, and therefore (it is urged by the underwriters, and has been repeatedly urged by them), the assured can only recover according to the damage he has sustained. This is true, and has uniformly been admitted. But if full compensation could only be demanded, where there was an actual total loss, an abandonment could only take place where there was nothing to abandon.
 

 There are situations in which the delay of the voyage, the deprivation of the right to conduct it, produce inconveniences to the assured, for the calculation of which, the law affords, and can afford, no standard. In such cases, there is, for the time, a total loss : and in this state of things, the assured may abandon to the underwriter, who stands in his place, and to whom justice is done, by enabling him to receive all that the assured might receive. A capture by an enemy, and an embargo by a foreign power, are admitted to be within this rule, and a complete arrest by a belligerent, not an enemy, seems, in reason, to be equally within it.
 

 It is, therefore, the unanimous opinion of the court, that where, as in this case, there is a complete taking at sea, by a belligerent, who has taken full possession of the vessel as prize, and continues that possession to the time of the abandonment, there exists, in point of law, a total loss, and the act of abandonment vests the right to the thing abandoned, in the underwriters, and the amount of insurance, in the assured.
 

 2. Have any circumstances occurred, since the abandonment, which have converted this total into a partial loss ? Without reviewing the conduct of the assured, subsequent to that period, it will be sufficient to observe, that he has performed no act which can be construed into a relinquishment of the right which was vested in him by the offer to abandon.
 

 It only remains, then, to inquire, whether the release and return of the *46] Manhattan deprives the assured of *the right to resort to the underwriters for a total loss, which was given by the abandonment ? This point has never been decided in the courts of England. In the case of
 
 Hamilton
 
 v.
 
 Mendes,
 
 Lord Mansfield leaves it completely undetermined, whether the state of loss, at the time the abandonment is made, or at the time of action brought, or at the time of the verdict rendered, shall fix the right to recover for a partial or a total loss.
 

 A majority of the judges are of opinion, that the state of loss, at the time of the abandonment, must fix the rights of the parties to recover on an
 
 *29
 
 action afterwards brought; and the judge who doubts respecting it, is of opinion, that, in this case, counter-security having been refused by the underwriters, the question of freight is yet suspended. It is to be certified to the circuit court of Pennsylvania, that in the case stated for the opinion of this court, the plaintiff is entitled to recover for a total loss.